1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7

EASTERN DISTRICT OF CALIFORNIA

8
9

| | |
|---|---|
| R.D.T.M., | No. 1:25-cv-01141-KES-SKO (HC) |
| Petitioner, | |
| v. | ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |
| MINGA WOFFORD, Mesa Verde ICE Processing Center Facility Administrator; POLLY KAISER, Acting Field Office Director of the San Francisco Immigration and Customs Enforcement Office; TODD M. LYONS, Acting Director of United States Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the United States Department of Homeland Security; PAMELA BONDI, Attorney General of the United States, | Docs. 3, 7 |
| Respondents. | |

Petitioner R.D.T.M. is a noncitizen who entered the United States in 2023 as an unaccompanied minor.  After entry, she was briefly detained by immigration officials but then released to the care of a sponsor after immigration officials determined that she was neither a danger nor a flight risk.  Since then, she has lived with her family in Minnesota, graduated high school, gained lawful work authorization, worked in childcare services, and volunteered at a church in her community.  However, notwithstanding immigration officials' prior determination that she posed neither a flight risk nor a danger, and the lack of any evidence of a change in these circumstances, Immigration and Customs Enforcement ("ICE") agents re-detained her on September 1, 2025.

1

On September 7, 2025, petitioner filed a petition for writ of habeas corpus, Doc. 1, and a motion for a temporary restraining order, Doc. 3, arguing that her detention violated the Due Process Clause of the Fifth Amendment.[1]  The Court granted her motion on September 9, 2025, ordered her released, restrained respondents from re-detaining her without a pre-deprivation bond hearing, and ordered respondents to show cause why a preliminary injunction should not issue.  Doc. 7.  Respondents filed a response to the order to show cause on September 15, 2025.  Doc. 8.  Petitioner filed a reply on September 16, 2025.  Doc. 9.  The Court held a hearing on this matter on September 18, 2025.  Doc. 10.  For the reasons set forth below, the Court grants a preliminary injunction.

## I.    Background

Petitioner is a native and citizen of Honduras.  Doc. 8-1, Martinez Decl. at ¶ 5.  She first entered the United States in 2014, when she was around seven or eight years old.  *See* Doc. 3-2 at ¶ 5; Doc. 8-1, Martinez Decl. at ¶ 5.  She arrived with her mother, and both were briefly detained upon entry by U.S. immigration officials but then released and placed in removal proceedings. Doc. 8-1, Martinez Decl. at ¶ 5.  Petitioner was ordered removed from the United States on June 8, 2016, after she failed to appear for a hearing at the Houston Immigration Court.  *Id.* ¶ 6. Petitioner indicates that she left the United States voluntarily when she was ten years old and did not know that she had been ordered removed.  *See* Doc. 3-2 at ¶¶ 5, 13.

In 2023, when she was seventeen, petitioner left Honduras, fleeing circumstances that she indicates made her a vulnerable target for physical and sexual violence.  Doc. 1 at ¶ 43; *see* Doc. 3-2 at ¶ 5.  On January 14, 2023, she crossed the southern border and encountered U.S. Border Patrol agents.  *Id.* ¶ 6; Doc. 1 at ¶ 43.  The agents designated her as an unaccompanied minor and transferred her to U.S. Department of Health and Human Services, Office of Refugee Resettlement ("ORR") custody.  Doc. 8-1, Martinez Decl. at ¶ 8.  ORR detained her for approximately eleven days at a facility for unaccompanied minors.  Doc. 3-2 at ¶ 6.  On January

---

[1] Petitioner also filed a motion to proceed under pseudonym, which was granted by separate order.  *See* Doc. 6.

2

1   26, 2023, ORR released her on an order of recognizance to her mother.  *Id.*; Doc. 8-1, Martinez

2   Decl. at ¶ 8.

3          The statute that governs the detention of unaccompanied minors encountered at the

4   border, the Trafficking Victims Protection and Reauthorization Act ("TVPRA"), provides that, in

5   making custody determinations, ORR should consider "danger to self, danger to the community,

6   and risk of flight."  8 U.S.C. § 1232(c)(2)(A).  In releasing petitioner, ORR determined that

7   petitioner was not a flight risk or danger to the community.  *See Saravia v. Sessions*, 280 F. Supp.

8   3d 1168, 1176, 1178 (N.D. Cal. 2017) ("[Immigration officials] may release the minor to a

9   "sponsor" . . . so long as the minor is not dangerous . . . . Release [therefore] reflects a

10  determination by the government that the noncitizen is not a danger to the community or a flight

11  risk." (citing 8 U.S.C. § 1232(c)(2)(A)), *aff'd* 905 F.3d 1137 (9th Cir. 2018).  On February 11,

12  2023, the Department of Homeland Security ("DHS") sent petitioner a notice to appear in

13  immigration court for removal proceedings.  *Id.*; Doc. 3-3 at 1–3.  The notice to appear charged

14  her as removable under 8 U.S.C. § 1182(a)(6)(A)(i) as "an alien present in the United States

15  without being admitted or paroled."  Doc. 3-3 at 1–3.

16         Following her release from detention, petitioner went to live with her parents and siblings

17  in Howard Lake, Minnesota, and she established a life there.  Doc. 3-2 at ¶ 7.  On June 2, 2024,

18  she graduated from Lake-Waverly-Winsted High School.  *Id.*  After she graduated, she was

19  granted lawful work authorization and worked as a child-care professional at the Howard Lake-

20  Waverly-Winsted Laker Care Program.  *Id.*; Doc. 1 at ¶ 10.  She also worked as a waitress at a

21  restaurant in Howard Lake.  Doc. 3-2 at ¶ 7.  She joined St. John's Lutheran Church in Howard

22  Lake and regularly volunteers with church activities.  Doc. 1 at ¶ 47.  Her positive school,

23  employment, and volunteer work record are described in letters of support from Howard Lake

24  community members.  *See* Doc. 1-4 at 2–7.

25         Petitioner maintained a clean criminal record, pursued relief in her removal proceedings,

26  and complied with the requirements of her release.  *See* Doc. 1 at ¶¶ 10, 36, 47–48, 94; Doc. 8-1,

27  Ex. 9.  On October 10, 2023, she retained counsel and filed an application for asylum and

28  withholding of removal with United States Citizenship and Immigration Services ("USCIS").

Doc. 1 at ¶ 48.  An immigration judge administratively closed her removal proceedings due to the pending application for asylum with USCIS.  *Id.*  Petitioner's asylum application remains pending.  Doc. 3-2 at ¶ 9.

On September 1, 2025, over two and a half years after her release, Immigration and Customs Enforcement ("ICE") agents arrested petitioner as she was preparing to board a domestic flight at San Francisco International Airport to return to Minnesota.  Doc. 3-2 at ¶¶ 11.  The agents were dressed in plainclothes and did not present her with a warrant.  *Id.*  They asked for petitioner's identification documents, and she showed them her passport and work authorization permit.  *Id.*  Agents handcuffed her and took her property.  *Id.* ¶ 12.  They did not tell her why she was being arrested other than for "immigration case processing."  *Id.*; Doc. 8-1, Ex. 9 at 5.  Agents held petitioner in an immigration office in San Francisco for approximately thirty hours.  *Id.* ¶ 13.  They informed her that she had been ordered removed previously, and she told them that she was unaware of the prior order of removal.  Doc. 3-2 at ¶¶ 5, 13–14.  Petitioner explained to the agents that she currently has pending removal proceedings and had filed an asylum application with USCIS.  *Id.* at ¶¶ 13-14.  ICE agents then took petitioner in custody to Mesa Verde ICE Processing Center, an immigration detention center in Bakersfield, California.  *Id.* ¶ 14.  Petitioner was released on September 10, 2025, pursuant to the Court's prior order.  Doc. 8-1, Martinez Decl. at ¶ 14.

## II.    Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [her] favor, and that an injunction is in the public interest."  *Id.* at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311–12 (1982)).  "Likelihood of success on the merits is a threshold inquiry and is the most important factor."  *Simon v. City & Cnty. of San Francisco*, 135 F.4th 784, 797 (9th Cir. 2025) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020)).  "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the

1  merits—then a preliminary injunction may still issue if the balance of hardships tips sharply in the

2  plaintiff's favor, and the other two *Winter* factors are satisfied."  *Friends of the Wild Swan v.*

3  *Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

4  **III.   Discussion**

5  **a.   Petitioner is Likely to Succeed on the Merits.**

6  Petitioner asserts that she possesses a protected liberty interest under the Due Process

7  Clause and that, under the factors outlined in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), she

8  is entitled to a pre-deprivation bond hearing.  Doc. 3 at 12–23.

9  Respondents argue that petitioner is not entitled to the protections of the Due Process

10  Clause, asserting that petitioner is an applicant for admission to the United States and "has only

11  those rights regarding admission that Congress has provided by statute."  Doc. 8 at 6 (quoting

12  *DHS v. Thuraissigiam*, 591 U.S. 103, 139–40 (2020)).  Noting that Congress possesses "plenary

13  power to make rules for the admission of" noncitizens, *id.* (quoting *Kleindienst v. Mandel*, 408

14  U.S. 753, 766 (1972), they argue that petitioner's "rights are limited to whatever statutory rights

15  Congress provides."  *Id.*

16  Respondents' argument is unpersuasive.  First, it fails to appreciate the distinction

17  between persons already located inside the United States, like petitioner, and persons attempting

18  to enter the United States, like the petitioner in *Thuraissigiam*.  "It is well established that certain

19  constitutional protections available to persons inside the United States are unavailable to aliens

20  outside of our geographic borders."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing *United*

21  *States v. Verdugo–Urquidez,* 494 U.S. 259, 269 (1990); *Johnson v. Eisentrager,* 339 U.S. 763,

22  784 (1950)).  "But once an alien enters the country, the legal circumstance changes, for the Due

23  Process Clause applies to all 'persons' within the United States, including aliens, whether their

24  presence here is lawful, unlawful, temporary, or permanent."  *Id.*; *see Hernandez v. Sessions*, 872

25  F.3d 976, 990 (9th Cir. 2017) ("[I]t is well-established that the Due Process Clause stands as a

26  significant constraint on the manner in which the political branches may exercise their plenary

27  authority.").

28  Second, respondents' argument misconstrues the nature of the challenge that petitioner

5

1    brings in this case, which is a challenge to her detention. *Thuraissigiam* held that a petitioner

2    who was stopped at the border did not have any due process rights *regarding admission into* the

3    United States. *Thuraissigiam*, 591 U.S. at 107. However, petitioner challenges her re-detention

4    without a hearing; she does not challenge any determination regarding her admissibility. *See*

5    *Padilla v. ICE*, 704 F. Supp. 3d 1163, 1170–72 (W.D. Wash. 2023) (discussing *Thuraissigiam*

6    and explaining the distinction between a challenge to admission and a challenge to detention);

7    *Hernandez*, 872 F.3d at 981 ("[T]he government's discretion to [detain] non-citizens is always

8    constrained by the requirements of due process.").

9        "Although the Supreme Court has described Congress's power over the 'policies and rules

10    for exclusion of aliens' as 'plenary,' and held that this court must generally 'defer to Executive

11    and Legislative Branch decisionmaking in that area,' it is well-established that the Due Process

12    Clause stands as a significant constraint on the manner in which the political branches may

13    exercise their plenary authority"—through detention or otherwise. *Hernandez*, 872 F.3d at 990

14    n.17 (citing *Kleindienst*, 408 U.S. at 769; *Zadvydas*, 533 U.S. at 695). The Due Process Clause

15    protects petitioner, a person inside the United States, from unlawful detention. *See Zadvydas*, 533

16    U.S. at 693.

17        Next, respondents assert that petitioner is mandatorily detained pursuant to 8 U.S.C.

18    § 1225(b), and argue that, in other contexts, the Supreme Court has upheld mandatory detention

19    schemes. Doc. 8 at 4–6. However, respondents' argument that the government could re-detain

20    petitioner under § 1225(b), even though she was previously designated an unaccompanied minor

21    child, is unpersuasive. The detention of unaccompanied minor children is governed by the

22    TVPRA, which does not mandate detention. 8 U.S.C. § 1232(d)(2)(A)–(B). The TVPRA

23    provides that the government shall place unaccompanied minor children "in the least restrictive

24    setting that is in the best interest of the child." *Id.* Petitioner was designated an unaccompanied

25    minor child under the TVPRA when she arrived in the United States. Under the terms of a class

26    action settlement agreement in *J.O.P. v. U.S. Department of Homeland Security*, USCIS, the

27    agency adjudicating her asylum application, is forbidden from re-assessing whether she qualifies

28    as an unaccompanied minor child, even though she has since turned eighteen and has been

1   reunited with her parents.  *See J.O.P. v. U.S. Dep't of Homeland Security*, 338 F.R.D. 33, 44, 64

2   (D. Md. 2019) (entering a class-wide preliminary injunction reinstating the 2013 Kim

3   Memorandum, which provided that the government would not reassess whether an individual

4   qualified as an unaccompanied child under the TVPRA even if the applicant had turned 18 or

5   been reunited with a parent); Doc. 199-2 at ¶ A, *J.O.P. v. US Department of Homeland Security*,

6   No. 8:19-cv-01944-SAG (D. Md. July 30, 2024) (solidifying class-wide injunction in settlement

7   agreement).  Petitioner pointed this out in her petition and motion, and the government has not

8   identified its authority to reassess petitioner's status, particularly where petitioner's immigration

9   case, though it is administratively closed while USCIS considers petitioner's asylum application,

10  "remains under the jurisdiction and docket control of the immigration court."  Doc. 8-1, Ex. 8.

11      Even if petitioner were subject to mandatory detention, however, she may still press an as-

12  applied constitutional challenge to that detention, as she does here.  The government points to

13  *Demore v. Kim*, a case in which the Supreme Court upheld the constitutionality of § 1226(c), a

14  mandatory detention provision, on a facial challenge.  *Demore v. Kim*, 538 U.S. 510, 513 (2003).

15  A facial challenge requires a plaintiff to show that a statute is "unconstitutional in every

16  conceivable application."  *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998).  In

17  contrast, an as-applied challenge requires a plaintiff to show only that "the application of the

18  statute to a specific factual circumstance" is unconstitutional.  *Hoye v. City of Oakland*, 653 F.3d

19  835, 857 (9th Cir. 2011).  As other courts have explained in considering *Demore*, its conclusion

20  that § 1226(c)'s mandatory detention scheme is constitutional in some of its applications "does

21  not mean that the Court does not have the power to grant petitions for habeas corpus raising *as-*

22  *applied* constitutional challenges to [] detention without a bond hearing."  *Perera v. Jennings*, 598

23  F. Supp. 3d 736, 744 (N.D. Cal. 2022).  Here, petitioner presses an as-applied constitutional

24  challenge: she argues that the Due Process Clause bars the government from re-detaining her

25  without first providing a bond hearing.  Doc. 3 at 12–23.

26      Petitioner's as-applied constitutional challenge is analyzed "in two steps: the first asks

27  whether there exists a protected liberty interest under the Due Process Clause, and the second

28  examines the procedures necessary to ensure any deprivation of that protected liberty interest

accords with the Constitution."  *Garcia v. Andrews*, No. 2:25-cv-01884-TLN-SCR, 2025 WL 1927596, at *2 (E.D. Cal. July 14, 2025) (citing *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

### 1. Petitioner Possesses a Protected Liberty Interest.

A protected liberty interest may arise from a conditional release from physical restraint. *Young v. Harper*, 520 U.S. 143, 147–49 (1997).  Even when a statute allows the government to arrest and detain an individual, a protected liberty interest under the Due Process Clause may entitle the individual to procedural protections not found in the statute.  *See id.* (Due Process requires pre-deprivation hearing before revocation of preparole); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973) (same, in probation context); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) (same, in parole context).  To determine whether a specific conditional release rises to the level of a protected liberty interest, "[c]ourts have resolved the issue by comparing the specific conditional release in the case before them with the liberty interest in parole as characterized by *Morrissey*."  *Gonzalez-Fuentes v. Molina*, 607 F.3d 864, 887 (1st Cir. 2010) (internal quotation marks and citation omitted).

In *Morrissey*, the Supreme Court explained that parole "enables [the parolee] to do a wide range of things open to persons" who have never been in custody or convicted of any crime, including to live at home, work, and "be with family and friends and to form the other enduring attachments of normal life."  *Morrissey*, 408 U.S. at 482.  "Though the [government] properly subjects [the parolee] to many restrictions not applicable to other citizens," such as monitoring and seeking authorization to work and travel, her "condition is very different from that of confinement in a prison."  *Id.*  "The parolee has relied on at least an implicit promise that parole will be revoked only if [she] fails to live up to the parole conditions."  *Id.*  The revocation of parole undoubtedly "inflicts a grievous loss on the parolee."  *Id.* (quotations omitted).  Therefore, a parolee possesses a protected liberty interest in her "continued liberty."  *Id.* at 481–84.

Petitioner's release is similar.  For over two-and-a-half years, it allowed her to live with her family in Howard Lake and establish a life there.  She graduated high school in Howard Lake, became lawfully employed in childcare services and at a restaurant, and volunteered at her

8

1   church.  The government's release of petitioner in 2023 reflected a determination that she did not

2   pose a flight risk or danger to the community.  *See Saravia*, 280 F. Supp. 3d at 1176.  The

3   government acknowledges that petitioner has no criminal record.  *See* Doc. 8-1, Ex. 9 at 2.

4   Following her release in January 2023, petitioner complied with her release terms and appeared at

5   all immigration proceedings as required.  The government rearrested petitioner on September 1,

6   2025 without showing any changed circumstances in this regard, contradicting the "implicit

7   promise that [petitioner's freedom] will be revoked only if [she] fails to live up to the [release]

8   conditions." *Morrissey*, 408 U.S. at 482.

9        The Court finds that petitioner has a protected liberty interest in her release.  *See*

10  *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *4 (N.D. Cal. July 17,

11  2025) (recognizing that "the liberty interest that arises upon release [from immigration detention]

12  is *inherent* in the Due Process Clause"); *Ortega v. Kaiser*, No. 25-cv-05259-JST, 2025 WL

13  1771438, at *3 (N.D. Cal. June 26, 2025) (collecting cases finding that noncitizens who have

14  been released have a strong liberty interest).  The Court must therefore determine what process is

15  due before the government may terminate her liberty.

16                    **2.  A Pre-Deprivation Bond Hearing Is Required.**

17       Due process "is a flexible concept that varies with the particular situation."  *Zinermon v.*

18  *Burch*, 494 U.S. 113, 127 (1990).  The procedural protections required in a given situation are

19  evaluated using the *Mathews v. Eldridge* factors:

20           First, the private interest that will be affected by the official action;
             second, the risk of an erroneous deprivation of such interest through
21           the procedures used, and the probable value, if any, of additional or
             substitute procedural safeguards; and finally, the government's
22           interest, including the function involved and the fiscal and
             administrative burdens that the additional or substitute procedural
23           requirement would entail.

24  *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)); *see Hernandez*, 872 F.3d 976, 993

25  (9th Cir. 2017) (applying *Mathews* factors in immigration detention context).

26       Turning to the first factor, petitioner has a significant private interest in remaining free

27  from detention.  "Freedom from imprisonment—from government custody, detention, or other

28

                                                    9

forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."

*Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).  Petitioner had been out of custody for over two-and-a-half years, and during that time, began a life in Howard Lake, living with her parents and siblings, finishing school, gaining lawful employment, and volunteering at her church. Her detention denies her that freedom.  Petitioner's private interest in avoiding re-detention is substantial.

Furthermore, petitioner is covered by the settlement agreement in *J.O.P. v. US Department of Homeland Security*, No. 8:19-cv-01944-SAG (D. Md.), and that settlement agreement provides that anyone initially determined to be an unaccompanied minor must be permitted to pursue an asylum application with USCIS, even if there is already a final order of removal in place.  *See* Doc. 199-2 at ¶ I, *J.O.P. v. US Department of Homeland Security*, No. 8:19-cv-01944-SAG (D. Md. July 30, 2024).  Even if ICE did have the authority to re-detain petitioner under § 1225(b), which it has not shown, the government cannot remove petitioner pending USCIS's adjudication of her asylum application.

Second, "the risk of an erroneous deprivation [of liberty] is high" where, as here, "[petitioner] has not received any bond or custody redetermination hearing."  *A.E. v. Andrews*, No. 1:25-cv-00107-KES-SKO, 2025 WL 1424382, at *5 (E.D. Cal. May 16, 2025).  Civil immigration detention, which is "nonpunitive in purpose and effect[,]" is justified when a noncitizen presents a risk of flight or danger to the community.  *See Zadvydas*, 533 U.S. at 690; *Padilla*, 704 F. Supp. 3d at 1172.  Petitioner has no criminal history and the government does not dispute her assertion that she has attended every court hearing and check-in since she arrived in the United States in 2023.  *See* Doc. 1 at ¶¶ 10, 36, 47–48, 94.  Given the absence of any procedural safeguards to determine if her detention was justified, "the probable value of additional procedural safeguards, i.e., a bond hearing, is high."  *A.E.*, 2025 WL 1424382, at *5.

Third, the government's interest in detaining petitioner without a hearing is "low."  *Ortega*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019); *Doe*, 2025 WL 691664, at *6.  In immigration court, custody hearings are routine and impose a "minimal" cost.  *Doe*, 2025 WL 691664, at *6.  The government's interest is further diminished where a person "has consistently

1   appeared for her immigration hearings . . . and [] does not have a criminal record." *Pinchi*, 2025

2   WL 1853763, at *2.

3        On balance, the *Mathews* factors show that petitioner is entitled to a bond hearing, which

4   should have been provided before petitioner was detained.  "'[T]he root requirement' of the Due

5   Process Clause" is "'that an individual be given an opportunity for a hearing *before* he is deprived

6   of any significant protected interest.'"  *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542

7   (1985) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 379 (1971)); *see Zinermon*, 494 U.S. at 127

8   ("Applying [the *Mathews*] test, the Court usually has held that the Constitution requires some

9   kind of a hearing *before* the State deprives a person of liberty . . . .").  The Supreme Court has

10   held that Due Process requires a pre-deprivation hearing before those released on parole from a

11   criminal conviction can have their bond finally revoked.  *See Morrissey*, 408 U.S. at 480–86.  The

12   same is true for those subject to revocation of probation.  *Gagnon v. Scarpelli*, 411 U.S. at 782.

13        Given the absence of "evidence of urgent concerns," the Court concludes that "a *pre-*

14   deprivation hearing [was] required to satisfy due process."  *Guillermo M. R.*, 2025 WL 1983677,

15   at *9.  Numerous district courts have reached a similar conclusion.  *See, e.g.*, *id.*; *Garcia*, 2025

16   WL 1927596, at *5; *Pinchi*, 2025 WL 1853763, at *3–4; *Ortega*, 415 F. Supp. 3d at 970; *Doe v.*

17   *Becerra*, No. 2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025); *Diaz*

18   *v. Kaiser*, No. 3:25-cv-05071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025); *Romero v.*

19   *Kaiser*, No. 22-cv-02508-TSH, 2022 WL 1443250, at *4 (N.D. Cal. May 6, 2022); *Vargas v.*

20   *Jennings*, No. 20-cv-5785-PJH, 2020 WL 5074312, at *4 (N.D. Cal. Aug. 23, 2020).

21        With these considerations in mind, petitioner is likely to succeed on the merits.

22        **b.  Petitioner Will Face Irreparable Harm Without Injunctive Relief.**

23        Turning to the second *Winter* factor, petitioner's evidence shows that her detention caused

24   irreparable harm.  As the Supreme Court has recognized, incarceration "has a detrimental impact

25   on the individual" because "it often means loss of a job" and "disrupts family life."  *Barker v.*

26   *Wingo*, 407 U.S. 514, 532–33 (1972).  Petitioner's detention took her from her family, her

27   community, and the job she had pursuant to her employment authorization.

28        Moreover, "[i]t is well established that the deprivation of constitutional rights

1   'unquestionably constitutes irreparable injury." *Hernandez*, 872 F.3d at 994 (quoting *Melendres*

2   *v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).  "When an alleged deprivation of a constitutional

3   right is involved, most courts hold that no further showing of irreparable injury is necessary."[2]

4   *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, &

5   Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)).  Thus, petitioner faces irreparable

6   harm absent a temporary restraining order.

7        **c.   Balance of Equities and Public Interest**

8        When the government is the nonmoving party, "the last two *Winter* factors merge."  *Baird*

9   *v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (internal citations omitted).  Faced with a choice

10  "between [minimally costly procedures] and preventable human suffering," as discussed above,

11  the Court concludes "that the balance of hardships tips decidedly in [petitioner's] favor."

12  *Hernandez*, 872 F.3d at 996 (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983)).

13       The public interest also weighs in petitioner's favor.  "The public has a strong interest in

14  upholding procedural protections against unlawful detention, and the Ninth Circuit has

15  recognized that the costs to the public of immigration detention are staggering."  *Diaz*, 2025 WL

16  1676854, at *3 (citing *Jorge M.F. v. Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3)

17  (N.D. Cal. Mar. 1, 2021); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817,

18  838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's

19  constitutional rights.") (citing *Padilla*, 953 F.3d at 1147–48).

20       In conclusion, the Court finds that the requirements for issuing a preliminary injunction

21  are met.  Respondents may not re-detain petitioner unless the government proves by clear and

22  convincing evidence at a bond hearing before a neutral decisionmaker that petitioner is a flight

23  risk or danger to the community.

24       The bond requirement of Federal Rule of Civil Procedure 65(c) is waived.  Courts

25  regularly waive security in cases like this one.  *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir.

26

27  _____

    [2] The government argues that this presumption does not apply when a petitioner fails to establish
28  a likelihood of success on the merits, *see* Doc. 8 at 6–7, but as explained above, petitioner has
    shown a likelihood of success.

1    2011); *Garcia*, 2025 WL 1676855, at \*3; *Pinchi*, 2025 WL 1853763, at \*4; *Singh*, 2025 WL

2    1918679, at \*9.

3    **IV.    Conclusion and Order**

4           Accordingly, petitioner's motion for preliminary injunction, Doc. 3, is GRANTED.

5    Pending this case, respondents are ENJOINED AND RESTRAINED from re-detaining petitioner

6    unless they demonstrate, by clear and convincing evidence at a pre-deprivation bond hearing

7    before a neutral decisionmaker, that petitioner is a flight risk or danger to the community such

8    that her physical custody is legally justified.

9

10

11    IT IS SO ORDERED.

12       Dated:   September 18, 2025

13                       UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28